**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JEFFREY FLEISCHER,** | ) | |
| | ) | **Case No. 17-cv-08295** |
| **Plaintiff,** | ) | |
| | ) | **Honorable Judge Manish S. Shah** |
| **vs.** | ) | |
| | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **ACCESSLEX INSTITUTE d/b/a ACCESS** | ) | |
| **GROUP; CONDUENT EDUCATION** | ) | **JURY TRIAL DEMANDED** |
| **SERVICES, LLC f/k/a ACS EDUCATION** | ) | |
| **SERVICES; MASSACHUSETTS** | ) | |
| **HIGHER EDUCATION ASSISTANCE** | ) | |
| **CORPORATION d/b/a AMERICAN** | ) | |
| **STUDENT ASSISTANCE; DELTA** | ) | |
| **MANAGEMENT ASSOCIATES, INC.;** | ) | |
| **F.H. CANN & ASSOCIATES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT ACCESSLEX INSTITUTE'S ANSWER AND
AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant AccessLex Institute d/b/a Access Group ("Access Group"), for its answer and

affirmative defenses to the First Amended Complaint of Plaintiff, Jeffrey Fleischer, states as

follows:

**INTRODUCTION**

The Defendants in this case comprise the lender, the guarantor, the servicers, and the
collection agencies assigned to collect Plaintiff's student loan. Plaintiff Jeffrey Fleisher
consolidated several federal student loans through the Federal Family Education Loan Program
("FFELP") with Defendant Access Group in June, 2004. For years, Plaintiff was diligent in
making his student loan payments, even depleting his personal savings account when he was
unemployed.

When his savings was about to run out, in November 2011, and shortly before servicing of
the loan was transferred to Defendant ACS, Fleischer requested a forbearance. Despite Defendant
Access Group's, the loan's originator, approval of the forbearance request at that time, all of the
Defendants subsequently: (1) failed to honor the forbearance; (2) failed to provide notices

1

required by applicable federal guidelines; (3) failed to contact Plaintiff *at all* until *after* a purported default; and (4) attempted, and continue to attempt, to collect an incorrect and wrongfully-inflated loan balance.

Plaintiff has remained diligent and reasonable in his efforts to resolve this matter. He has offered to pay the correct loan balance in a lump sum. He has been diligent in dealing directly with each Defendant, as well attempting resolution through the Consumer Financial Protection Bureau, but to no avail. As a result, Plaintiff has been forced to retain counsel and file this lawsuit.

**ANSWER:** The "Introduction" of the Complaint consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over Plaintiff's Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA") claims pursuant to 28 U.S.C. § 1331 because such claims arise under the laws of the United States.

**ANSWER:** Access Group admits that this Court has jurisdiction over Plaintiff's claims but denies any violation of state or federal law.

2. Given the inextricably intertwined nature of Defendants' servicing and debt collection conduct involving Plaintiff's student loan account, this Court should exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims.

**ANSWER:** Access Group denies the allegations in Paragraph 2.

3. Alternatively, this Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

**ANSWER:** Access Group denies that the matter in controversy exceeds $75,000, exclusive of interest and costs. Access Group is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3 and, therefore, denies those allegations.

4. This Court has personal jurisdiction over all the Defendants, because they do business in the State of Illinois and a substantial part of the wrongful acts alleged in this Complaint were committed in Illinois.

**ANSWER:** Access Group admits that this Court has personal jurisdiction over Access Group but is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4 and, therefore, denies those allegations.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because Plaintiff resides in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here.

**ANSWER:** Access Group admits the allegations in Paragraph 5.

## PARTIES

6.      Plaintiff Jeffrey Fleischer is a citizen of the State of Illinois and resides in the City of Chicago.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 6 and, therefore, denies those allegations.

7.      Defendant Accesslex Institute d/b/a Access Group ("Access Group") is a foreign corporation, with its principal place of business located at 10 North High Street, Suite 400, West Chester, Pennsylvania 19380.

**ANSWER:** Access Group admits the allegations in Paragraph 7.

8.      In 2004, Access Group was in the business of offering student loans, and issued the Note implicated in this case; Access Group also initially serviced Plaintiff's consolidated loan.

**ANSWER:** Access Group admits the allegations in Paragraph 8.

9.      Access Group ceased providing loans in 2010 due to legislative action that eliminated the federal guaranteed student loan FFELP program.

**ANSWER:** Access Group denies the allegations in Paragraph 9.

10.      The loan-servicing performed by Access Group, including the servicing of Plaintiff's loan, was transferred to ACS Education Services on or about December 23, 2011. See *December 23, 2011 Access Group Press Release*, attached hereto as Exhibit A.

**ANSWER:** Access Group admits that Plaintiff's student loan was transferred to ACS for servicing in February 2012.

3

11.     Defendant Conduent Education Services, LLC f/k/a ACS Education Services ("ACS") is a Delaware limited liability company, with its principal executive offices located at 2277 E. 20th Street, Long Beach, California 90810.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 11 and, therefore, denies those allegations.

12.     From 2003 to 2013, as a subsidiary of Xerox, ACS handled servicing of student loans under a Department of Education contract worth an estimated $2 billion.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 12 and, therefore, denies those allegations.

13.     According to Conduent's website, on January 1, 2017, ACS became part of Conduent Business Services, LLC, the world's largest business process services company.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 13 and, therefore, denies those allegations.

14.     Since becoming a subsidiary of Conduent Business Services, ACS is now Conduent Education Services, LLC.

**ANSWER:**  Access Group admits the allegations in Paragraph 14.

15.     Defendant Massachusetts Higher Education Assistance Corporation d/b/a American Student Assistance ("ASA") is a Massachusetts non-profit corporation, with its corporate headquarters located at 100 Cambridge Street, Suite 1600, Boston, Massachusetts 02114.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 15 and, therefore, denies those allegations.

16.     ASA is a FFELP guarantor; while federal legislation ended privately financed, federally- guaranteed education loans under the FFELP, ASA continues to fulfill its obligations as a guarantor for its remaining FFELP portfolio, which stands at approximately $35 billion and 1.3 million borrowers.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 16 and, therefore, denies those allegations.

4

17.    Defendant Delta Management Associates, Inc. ("Delta Management") is a Massachusetts collection agency with its corporate headquarters located at 100 Everett Ave., Suite 6, Chelsea, Massachusetts 02150.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 17 and, therefore, denies those allegations.

18.    According to its website, "[f]or more than 31 years, Delta has offered superior recovery and default management solutions to clients in the higher education, government and financial services industries."

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 18 and, therefore, denies those allegations.

19.    Defendant F.H. Cann & Associates ("F.H. Cann") is a Massachusetts collection agency with its principal place of business located at 1600 Osgood St., Suite 20-2/20, North Andover, Massachusetts 01845.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 19 and, therefore, denies those allegations.

20.    According to its website, F.H. Cann was established in 1999 and "utilizes the latest technology the collection industry has to offer in order to maintain both a competitive advantage and a high level of compliance and recoveries in this ever-evolving profession."

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 20 and, therefore, denies those allegations.

## THE FFELP SYSTEM AND STUDENT LOANS GENERALLY

21.    According to the Consumer Financial Protection Bureau ("CFPB"), as of September 2015, more than 41 million Americans collectively owe more than $1.2 trillion in student loan debt, making student loan debt the second-largest class of consumer debt behind mortgages.  See *September 2015 CFPB Report on Student Loan Servicing*, attached hereto as Exhibit B.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 21 and, therefore, denies those allegations.

22.     More than one-in-four student loan borrowers are now delinquent or in default on a student loan. *Id.*

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 22 and, therefore, denies those allegations.

23.     When a borrower defaults on a student loan and the lender is unable to recover the amount, the lender recoups its loss from the guarantor.

**ANSWER:**  Access Group admits only that, under certain circumstances, a lender is able to recover a portion of its losses on a defaulted student loan from a guarantor.

24.     After a guaranty is paid, the Department of Education ("ED") acts as a secondary insurer on a FFELP loan, such as Plaintiff's.

**ANSWER:**  Access Group admits the allegations in Paragraph 24.

25.     Thus, when a lender assigns a defaulted loan, the guarantor must take diligent steps to recover the default amount, but, having done so, may then also recover up to one hundred percent of its losses from ED.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 25 and, therefore, denies those allegations.

26.     Lenders and guarantors are therefore insulated from loss.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 26 and, therefore, denies those allegations.

27.     This system, in which losses are ultimately borne by the Taxpayer, inures to the benefit of not only the lenders and guarantors, but to student loan servicers and collectors as well.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 27 and, therefore, denies those allegations.

28.     For example, except in extraordinary circumstances, student loan debt is not dischargeable in bankruptcy.

**ANSWER:**  Access Group admits the allegations in Paragraph 28.

6

29.     Also, lenders, servicers, and collectors are not constrained by any statute of limitations in which to sue, collect, or otherwise enforce student loans.

**ANSWER:**  Access Group denies the allegations in Paragraph 29.

30.     Student debtors' wages can be administratively garnished, without benefit of a judgment, and their tax refunds may be intercepted via the Treasury Offset Program, or "TOP."

**ANSWER:**  Access Group admits the allegations in Paragraph 30.

31.     As a consequence, there are few economic incentives for student lenders, servicers, guarantors, and collectors to provide superior customer service.

**ANSWER:**  Access Group denies the allegations in Paragraph 31.

## ORIGINATION AND PAYMENT HISTORY

32.     In this case, on or about June 1, 2004, Plaintiff Jeffrey Fleischer consolidated several undergraduate and graduate student loans with Access Group. See *Federal Consolidation Loan Application and Promissory Note,* attached hereto as Exhibit C.

**ANSWER:**  Access Group admits the allegations in Paragraph 32.

33.     After Fleischer's purported default, Access Group recouped the loan balance from guarantor ASA on or about March 26, 2013, according to ACS' response to Plaintiff's CFPB complaint dated March 29, 2017. Ex. H, *infra*.

**ANSWER:**  Access Group admits only that a portion of Plaintiff's loan balance was paid

by guarantor ASA on or about March 26, 2013.

34.     After consolidating his loans in June 2004, Plaintiff timely made all of his required payments to Defendant Access Group for the remainder of that year.

**ANSWER:**  Access Group admits the allegations in Paragraph 34.

35.     Plaintiff timely made all of his required payments to Access Group in 2005.

**ANSWER:**  Access Group admits the allegations in Paragraph 35.

36.     Plaintiff timely made all of his required payments to Access Group in 2006.

**ANSWER:**  Access Group admits the allegations in Paragraph 36.

37.     In 2007, Access Group lowered Plaintiff's interest rate from 3.5% to 2.5% as a result of Plaintiff making 36 consecutive timely payments.

**ANSWER:**  Access Group admits the allegations in Paragraph 37.

38.     Plaintiff timely made all of his required payments to Access Group in 2007.

**ANSWER:**  Access Group admits the allegations in Paragraph 38.

39.     In 2008, Plaintiff Jeffrey Fleischer accepted a temporary, grant-funded position abroad.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 39 and, therefore, denies those allegations.

40.     Plaintiff timely made all of his required payments to Access Group in 2008, while abroad.

**ANSWER:**  Access Group admits that Plaintiff made all of his required student loan payments to Access Group in 2008 but is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 40 and, therefore, denies those allegations.

41.     At the end of 2008, Plaintiff returned to the United States and, like many Americans at that time, had difficulty securing employment.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 41 and, therefore, denies those allegations.

42.     Despite being unemployed, Plaintiff utilized his savings to timely make all required payments to Access Group in 2009.

**ANSWER:**  Access Group admits that Plaintiff made a payment of $3,600 on February 11, 2009, which covered all payments due through December 2010 but is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 42 and, therefore, denies those allegations.

43.     Plaintiff continued to utilize his savings to timely make all required payments to Access Group in 2010.

8

**ANSWER:** Access Group admits that Plaintiff made a payment of $3,600 on February 11, 2009, which covered all payments due through December 2010 but is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 43 and, therefore, denies those allegations.

44. At the beginning of 2011, Plaintiff remitted a $3000 payment to Access Group to cover all required payments for the following year.

**ANSWER:** Access Group admits that Plaintiff missed his January 2011 payment but made a $3,000 payment to Access Group on February 1, 2011, at which point the loan was 30 days past due. Access Group further admits that Plaintiff's February 1, 2011 payment covered all payments due through December 2011 but is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 44 and, therefore, denies those allegations.

45. Accordingly, Plaintiff paid significantly more in student loan payments than he earned working in 2009, 2010, and 2011.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 45 and, therefore, denies those allegations.

**Plaintiff's Forbearance Request and the Servicing Transfer of the Loan**

46. In or about November, 2011, in response to his depleted savings and continued difficulty in securing a consistent income, Plaintiff applied for a forbearance of his student loan agreement with Access Group.

**ANSWER:** Access Group denies the allegations in Paragraph 46.

47. Plaintiff then called Access Group to follow up on his application.

**ANSWER:** Access Group denies the allegations in Paragraph 47.

48. During that phone conversation, the Access Group representative informed Plaintiff that: (1) Plaintiff's application for forbearance was accepted; (2) the loan's 2.5% interest rate would continue to accrue during the forbearance; (3) the forbearance would last up to three

years; and (4) Access Group had sent the forbearance acceptance letter to Plaintiff's previous address.

**ANSWER:**  Access Group denies the allegations in Paragraph 48.

49.    In response, during that conversation, Plaintiff made sure to provide the Access Group representative with his correct, current address at 6118 N. Sheridan Rd. Apt. 902, Chicago, Illinois; to be certain, Plaintiff had the representative read his address and telephone number back to him to confirm that Access Group had his current information.

**ANSWER:**  Access Group denies the allegations in Paragraph 49.

50.    At that time, when the forbearance period started, Plaintiff's student loan balance was approximately $38,000.

**ANSWER:**  Access Group denies the allegations in Paragraph 50.

51.    Shortly thereafter, on December 23, 2011, according to the press release, "Access Group, Inc. Select[ed] ACS, A Xerox Company for Loan Servicing." Ex. A.

**ANSWER:**  Access Group denies that Plaintiff ever applied for or called to inquire about

a forbearance on his student loans but admits that Access Group transferred its student loan

portfolio to ACS for servicing in February 2012.

52.    Also according to its press release, "[t]he conversion of the loans to the ACS system is subject to the confirmation of applicable rating agencies of the ratings of Access Group's asset-backed securities that finance the loan portfolio. The conversion is expected to be completed by March 31, 2012." *Id.* (Emphasis supplied).

**ANSWER:**  Access Group admits the allegations in Paragraph 52.

53.    Access Group did not send the press release to Plaintiff, nor any notice of the servicing transfer from Access Group to ACS.

**ANSWER:**  Access Group denies the allegations in Paragraph 53.

54.    Additionally, Plaintiff, unaware of the servicing transfer, never received any written confirmation of the forbearance from either Access Group or ACS.

**ANSWER:** Access Group denies that Plaintiff ever applied for a forbearance from Access Group. Access Group is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 54 and, therefore, denies those allegations.

55. In fact, Plaintiff received no correspondence from any entity regarding the subject student loan account for the next 23 months.

**ANSWER:** Access Group denies the allegations in Paragraph 55 as they pertain to Access Group.

56. Historically, Xerox/ACS' record of transferring loans has not been stellar. *See December 13, 2012 "Final Alert Memorandum" and November 5, 2015 "Functionality of the Debt Management Collection System 2" Final Audit Report*, concerning ACS' inability to implement the Debt Collection Management System 2 ("DMCS2"), both from Department of Education's Office of Inspector General ("OIG"), attached hereto as Group Exhibit D.

**ANSWER:** Access Group denies the allegations in Paragraph 56.

57. The foregoing Paragraph is consistent with Plaintiff's allegations that neither Access Group nor ACS ever informed Plaintiff of the servicing transfer.

**ANSWER:** Access Group denies the allegations in Paragraph 57.

**Two Years after Access Group-ACS Servicing Transfer, Collection Efforts Resume**

58. On November 8, 2013, Plaintiff received a letter from Defendant Delta Management, a company that Plaintiff had never heard of, stating:

(a) The subject student loan was in default;

(b) The subject student loan account was now serviced by ACS, another company that Plaintiff, at that time, had never heard of;

(c) The subject student loan account was now owned by ASA, yet another company that Plaintiff had never heard of; and

(d) The subject student loan balance was now approximately $51,000.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 58 and, therefore, denies those allegations.

59.     Plaintiff was alarmed that his balance had increased by approximately $13,000, as the balance on a $38,000 loan at 2.5%, compounded, should have only been approximately $39,923.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 59 and, therefore, denies those allegations.

60.     Thus, on information and belief, which Plaintiff verily believes, the additional fees and/or an increased interest rate related to the wrongful default increased his indebtedness by over $11,000.

**ANSWER:** Access Group denies the allegations in Paragraph 60.

61.     That same day, November 8, 2013, Plaintiff called Access Group, because it was Access Group who granted the forbearance in or about November 2011; Access Group confirmed that the loan had been transferred and that he should call ACS.

**ANSWER:** Access Group denies the allegations in Paragraph 61.

62.     Access Group did not explain why he was not informed sooner, in writing, of the transfer of the consolidated loan.

**ANSWER:** Access Group denies that it failed to inform Plaintiff in writing upon the transfer of his loan to ACS for servicing in February 2012 and further denies that Plaintiff called Access Group in November 2013.

63.     Also that same day, November 8, 2013, Plaintiff filed a complaint with the CFPB.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 63 and, therefore, denies those allegations

64.     On November 12, 2013, Plaintiff called Delta Management and spoke to representative Jose Torres, who stated that he would note that the subject account was in dispute and transferred Plaintiff to his supervisor, Irene Metcalfe.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 64 and, therefore, denies those allegations

65. Ms. Metcalfe, who noted that Plaintiff had "excellent credit" and acknowledged that Plaintiff's confusion made sense, told Plaintiff to call ASA because, "they're good at working with situations like this."

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 65 and, therefore, denies those allegations

66. Two days later, on November 14, 2013, Plaintiff called ASA and spoke to a representative who refused to provide his name and repeatedly cut Plaintiff off, interrupting him when he attempted to explain the situation and his confusion.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 66 and, therefore, denies those allegations

67. When Plaintiff told the ASA representative that he hadn't heard of ASA, ACS, or Delta Management before, the representative said that was because "we had to track you down."

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 67 and, therefore, denies those allegations.

68. Thus, Plaintiff was shuffled from Access Group to Delta Management, then from Delta Management to ASA, without any Defendant providing information about Plaintiff's loan.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 68 and, therefore, denies those allegations.

69. The ASA representative's characterization "we had to track you down" was false, because, as stated *supra*, Plaintiff provided Access Group with his address and telephone number in December, 2011, and that information remained the same thereafter.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 69 and, therefore, denies those allegations

70. Additionally, even if the Access Group representative did not properly record Plaintiff's correct address, his address was readily accessible to Defendants, as it has been reported on Plaintiff's Transunion credit report since December 18, 2011. See *First Page of Plaintiff's April 19, 2017 Transunion Credit Report*, attached hereto as Exhibit E.

**ANSWER:** Access Group denies that it failed to properly record Plaintiff's address but is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 70 and, therefore, denies those allegations.

71.     After being shuffled back and forth, and getting nowhere in his attempt at obtaining an answer and resolution with the unnamed ASA representative, Plaintiff was forced to retain an attorney.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 71 and, therefore, denies those allegations.

72.     On November 27, 2013, Plaintiff's prior counsel sent a letter to ASA and Delta Management explaining the situation and disputing the purported amount of Plaintiff's debt. See *November 27, 2013 Correspondence,* attached hereto as Exhibit F.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 72 and, therefore, denies those allegations

73.     Specifically, the November 27, 2013 letter disputed the amount ASA claimed was owed, described Plaintiff's long history of timely payments, and noted that neither ACS nor ASA notified Plaintiff of the loan's transfer, any servicing transfer, or the purported default. *Id.*

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 73 and, therefore, denies those allegations.

74.     Plaintiff's prior counsel received no response until over two months later; and the January 28, 2017 response only requested a third party authorization in order to speak to or correspond with Plaintiff's prior counsel. See *January 28, 2014 ASA Correspondence*, attached hereto as Exhibit G.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 74 and, therefore, denies those allegations.

75.     Plaintiff immediately faxed a third-party authorization letter to ASA.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 75 and, therefore, denies those allegations.

14

76.    Another two full months later, in April 2014, Plaintiff's prior counsel received a letter from ASA that did not respond to any issue raised in the correspondence, but instead simply reiterated the purported amount of debt and fees, and failed to acknowledge Plaintiff's forbearance agreement and Defendants' failure to provide notice of the ownership transfer, servicing transfer, and pending "default."

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 76 and, therefore, denies those allegations.

77.    Plaintiff's prior counsel responded to ASA's letter by reasserting that the collection fees and amount purportedly owed were illegitimate and offered to pay ASA the legitimate amount of the debt.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 77 and, therefore, denies those allegations.

78.    ASA responded by demanding that Plaintiff's prior counsel speak to Delta Management, instead of ASA, about the issue.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 78 and, therefore, denies those allegations.

79.    Thus, Plaintiff, through counsel, was again shuffled from one entity to the other without answers or a resolution.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 79 and, therefore, denies those allegations.

80.    Plaintiff's prior counsel then contacted Delta Management.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 80 and, therefore, denies those allegations.

81.    In response, on or about May 28, 2014, Delta Management sent Plaintiff's prior counsel a request for a third-party authorization.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 81 and, therefore, denies those allegations.

82.     Again, Plaintiff promptly sent the requested third-party authorization to Delta Management.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 82 and, therefore, denies those allegations.

83.     Plaintiff's prior counsel subsequently had several phone conversations with Delta Management representatives.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 83 and, therefore, denies those allegations.

84.     In one conversation, a Delta Management representative claimed that ASA sent letters to Plaintiff starting in March 2013 to Plaintiff's correct address, none of which Plaintiff ever received.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 84 and, therefore, denies those allegations.

85.     The foregoing false assertion that "letters were sent" contradicts the ASA representative's previous false assertion that they "had to track [Plaintiff] down."

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 85 and, therefore, denies those allegations.

86.     In another conversation, a Delta Management representative claimed that Defendants tried calling Plaintiff and that his "voicemail wasn't set up;" however, Plaintiff's phone number has remained the same since November 2011 and his phone has continuously had voicemail since the day it was activated.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 86 and, therefore, denies those allegations.

87.     In yet another conversation, a Delta Management representative acknowledged that ACS had never provided any paperwork related to the servicing and ownership of the subject loan, either to ASA or Delta Management; and therefore Delta Management could not provide any relevant documents to Plaintiff's prior counsel.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 87 and, therefore, denies those allegations.

88.     Plaintiff subsequently received no correspondence from any of the Defendants, nor any meaningful information from the CFPB regarding his November 8, 2013 complaint, for approximately two years.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 88 and, therefore, denies those allegations.

89.     In February, 2017, Plaintiff escalated the matter to the offices of Senators Dick Durbin and Tammy Duckworth.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 89 and, therefore, denies those allegations.

90.     Plaintiff received prompt responses from both Senators' offices stating that they had forwarded his requests for escalation to the CFPB.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 90 and, therefore, denies those allegations.

91.     On or about April 8, 2017, over three years' after he filed a complaint, Plaintiff received a letter dated March 29, 2017 from the CFPB with ACS' "Response" attached. See *March 29, 2017 CFPB Correspondence*, attached hereto as Exhibit H.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 91 and, therefore, denies those allegations.

92.     ACS' CFPB Response claims that Plaintiff's student loan account became past due in March 2012, that past due notices were sent, and collection attempts were made, but no supporting documentation was attached or provided. *Id.*

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 92 and, therefore, denies those allegations.

93.     Further, ACS' Response states that "[i]f [Plaintiff] is able to provide proof that his loans were rehabilitated he should forward this information to us." *Id.*

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 93 and, therefore, denies those allegations.

94. However, any documentary evidence, including transcripts of phone conversations, relating to Plaintiff's forbearance is in Defendants' exclusive possession and control.

**ANSWER:** Access Group denies that Plaintiff ever applied to Access Group for a forbearance but is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 94 and, therefore, denies those allegations.

95. Two days later, on or about April 10, 2017, Plaintiff received a letter from F.H. Cann attempting to collect the subject student loan account. See *April 4, 2017 F.H. Cann Correspondence*, attached hereto as Exhibit I.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 95 and, therefore, denies those allegations.

96. On April 27, 2017, Plaintiff sent a letter to F.H. Cann disputing the stated amount owed. See *April 27, 2017 Plaintiff Correspondence*, attached hereto as Exhibit J.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 96 and, therefore, denies those allegations.

97. In response, on or about June 1, 2017, F.H. Cann sent Plaintiff another letter that simply reiterated that the subject student loan account is in default, without providing any supporting documentation for the amount allegedly owed. See *June 1, 2017 F.H. Cann Correspondence*, attached hereto as Exhibit K.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 97 and, therefore, denies those allegations.

98. Thus, F.H. Cann failed to provide a validation of the debt to Plaintiff.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 98 and, therefore, denies those allegations.

99. In addition, F.H. Cann's June 1, 2017 letter states, in relevant part:

18

American Student Assistance has entered into an agreement with the U.S. Department of Education to participate in the federal loan rehabilitation program. Under the program, borrowers who make 9 qualifying payments over a 10 month period can have their defaulted loans rehabilitated and enjoy benefits including:
* **Deletion of default status to the major credit reporting bureaus**

* Avoidance of involuntary wage garnishment

* Removal from the Treasury Offset Program

* Return to standard loan servicing (no more collection agencies)

Ex. K (**emphasis supplied**).

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 99 and, therefore, denies those allegations.

100.    The ED contracts with Private Collection Agencies ("PCAs") in effort to collect on defaulted student loans.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 100 and, therefore, denies those allegations.

101.    Defendant F.H. Cann is one such PCA that has a contract with the ED. See *F.H. Cann Contract*, attached hereto as Exhibit L.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 101 and, therefore, denies those allegations.

102.    The ED provides guidelines, policies, and procedures to PCAs in their student loan debt collection efforts in the form of a PCA Procedures Manual. See *PCA Procedures Manual: 2009 ED Collections Contract* cover page and excerpt, attached hereto as Exhibit M.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 102 and, therefore, denies those allegations.

103.    The PCA Manual incorporates related law and regulations: "[t]he guaranty agencies, lenders or subsequent note holders will adhere to the due diligence requirements in making, disbursing, servicing and collecting loans as outlined in the applicable regulations, 34 CFR 682.206-208; 34 CFR 682.411; and 34CFR 682.507;" the PCA Manual also states that "[t]he

FDCPA does, however, apply to the PCAs ED retains to perform collection services on student loans."

**ANSWER**: Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 103 and, therefore, denies those allegations.

104. The PCA Manual also states, in relevant part:

Collectors must not state or imply to borrowers that the default information reported by the original lender (e.g., the bank that made the FFEL) or by the guaranty agency or Department will be deleted or expunged before the applicable 7-year period has run. *Id*.

**ANSWER**: Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 104 and, therefore, denies those allegations.

105. As set forth *supra*, in its June 1, 2017 letter, F.H. Cann stated that Plaintiff could enjoy "deletion of default status to the major credit reporting bureaus," in direct contravention of the ED's PCA Procedures Manual.

**ANSWER**: Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 105 and, therefore, denies those allegations.

### Plaintiff's Treasury Offset

106. On or about June 9, 2017, the Department of the Treasury sent a letter to Plaintiff stating that it had seized Plaintiff's federal income tax refund, totaling $2,223.71, and applied it to his student loan account owned by ASA. See *TOP Correspondence,* attached hereto as Group Exhibit N.

**ANSWER**: Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 106 and, therefore, denies those allegations.

107. Subsequently, on September 21, 2017, the Internal Revenue Service ("IRS") sent a letter to Plaintiff stating that it had sent Plaintiff a refund check for $2,223.71 in error, as it had misapplied another taxpayer's statement to his account, and demanding the money back. *Id*.

**ANSWER**: Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 107 and, therefore, denies those allegations.

108.    Since the filing of the original complaint in this matter, the IRS subsequently rescinded the demand in a letter dated October 16, 2017. *Id.*

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth

of the allegations in Paragraph 108 and, therefore, denies those allegations.

109.    Thus, on information and belief, one or more of the Defendants wrongfully referred Plaintiff's loan for a TOP, causing him distress, inconvenience, and fear of an unmerited prosecution by the IRS.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth

of the allegations in Paragraph 109 and, therefore, denies those allegations.

### The Higher Education Act and its Implementing Regulations

110.    The Higher Education Act ("HEA") was enacted in 1965 and was intended "to strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education."

**ANSWER:**  Paragraph 110 consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

111.    The HEA initiated the Federal Family Education Loan Program ("FFELP"), which was the second largest of the federal higher education loan programs.

**ANSWER:**  Access Group admits the allegations in Paragraph 111.

112.    On April 24, 2009, President Obama called for an end to FFELP, calling it a wasteful and inefficient system.

**ANSWER:**  Access Group admits the allegations in Paragraph 112.

113.    On or about January 5, 2010, FFELP was eliminated and no subsequent loans were permitted to be made under the program after June 30, 2010.

**ANSWER:**  Access Group admits the allegations in Paragraph 113.

114.    However, lenders/servicers continue to service approximately $253 billion in outstanding FFELP loans.

**ANSWER:**  Access Group admits the allegations in Paragraph 114.

115.   As part of servicing FFELP loans like Plaintiff's, lenders/servicers are required to follow certain servicing regulations and guidelines.

**ANSWER:**  Access Group admits the allegations in Paragraph 115.

116.   As set forth below, Defendants violated several regulations in the servicing of Plaintiff's FFELP loan.

**ANSWER:**  Access Group denies the allegations in Paragraph 116 as they pertain to Access Group.

### The Defendants Failed to Document and Record Plaintiff's Forbearance

117.   As set forth *supra*, in or about December, 2011, Access Group told Plaintiff over the telephone that he was being granted a forbearance.

**ANSWER:**  Access Group denies the allegations in Paragraph 117.

118.   Also, at that time, Plaintiff advised Access Group of his new address, specifically asking the representative to repeat it over the phone.

**ANSWER:**  Access Group denies the allegations in Paragraph 118.

119.   Pursuant to 34 CFR § 682.211(b)(1), a lender may grant forbearance if:

(1) The lender and the borrower or endorser agree to the terms of the forbearance and, unless the agreement was in writing, the lender sends, within 30 days, a notice to the borrower or endorser confirming the terms of the forbearance and records the terms of the forbearance in the borrower's file.

Emphasis supplied.

**ANSWER:**  Paragraph 119 consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

120.   Because the agreement was not in writing, the servicer was obligated to send notice to Plaintiff and record the terms of the forbearance in Plaintiff's file.

**ANSWER:**  Access Group denies the allegations in Paragraph 120 as they pertain to Access Group and affirmatively states that Plaintiff never applied for nor was granted a forbearance from Access Group.

121.    The servicer, whether Defendant Access Group or Defendant ACS, failed to send notice to Plaintiff.

**ANSWER:**  Access Group denies the allegations in Paragraph 121 as they pertain to Access Group and affirmatively states that Plaintiff never applied for nor was granted a forbearance from Access Group.

122.    Also, on information and belief, the servicer failed to record the terms of the forbearance in Plaintiff's file.

**ANSWER:**  Access Group denies the allegations in Paragraph 122 as they pertain to Access Group and affirmatively states that Plaintiff never applied for nor was granted a forbearance from Access Group.

123.    Having failed to properly document the forbearance and terms thereof, the servicer, either Access Group or ACS, continued to improperly service Plaintiff's student loan.

**ANSWER:**  Access Group denies the allegations in Paragraph 123 as they pertain to Access Group and affirmatively states that Plaintiff never applied for nor was granted a forbearance from Access Group.

### Defendants Failed to Send Required Notices during Forbearance

124.    When a loan is placed in forbearance, as Plaintiff's was in or about December 2011, the servicer must contact the borrower every 180 days. 34 CFR 682.211(e).

**ANSWER:**  Access Group denies the allegations in Paragraph 124.

125.    The servicer(s) in this case, however, failed to contact Plaintiff for 23 months.

**ANSWER:**  Access Group denies the allegations in Paragraph 125 as they pertain to Access Group.

126.    When a loan is in forbearance, the notice required under 34 CFR 682.211(e) must contain the following information:

(i)    The outstanding obligation to repay;

23

(ii)  The amount of the unpaid principal balance and any unpaid interest that has accrued on the loan since the last notice provided to the borrower or endorser under this paragraph;

(iii)  The fact that interest will accrue on the loan for the full term of the forbearance;

(iv)  The amount of interest that will be capitalized, as of the date of the notice, and the date capitalization will occur;

(v)  The option of the borrower or endorser to pay the interest that has accrued before the interest is capitalized; and

(vi)  The borrower's or endorser's option to discontinue the forbearance at any time.

34 CFR § 682.211(e)(i)-(vi).

**ANSWER:**  Paragraph 126 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

127.  The loan servicer(s), whether Access Group and/or ACS, failed to send the information required every 180 days during a forbearance for a period between December 2011 and November 8, 2013, thus violating the law at least three times during that period.

**ANSWER:**  Access Group denies the allegations in Paragraph 127 as they pertain to Access Group.

**Defendants Failed to Exercise "Due Diligence" Prior to Declaring Default**

128.  According to ACS, in or about March 2012, Defendant ACS (wrongfully) declared Plaintiff's loan "delinquent."

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 128 and, therefore, denies those allegations.

129.  In cases of delinquency, the servicer's actions are prescribed by 34 CFR § 682.411, which requires "due diligence."

**ANSWER:**  Paragraph 129 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

24

130.     ACS failed to exercise due diligence in servicing Plaintiff's loan.

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 130 and, therefore, denies those allegations.

131.     ACS failed to send at least one written notice during the first 15 days of the "delinquency," in violation of 34 CFR § 682.411(c).

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 131 and, therefore, denies those allegations.

132.     During the 16-180 days of the "delinquency," ACS failed to make four diligent efforts to contact Plaintiff by phone and send four letters to Plaintiff at the address Plaintiff provided during his conversation with Access Group in or about December 2011, and available on Plaintiff's credit report, in violation of 34 CFR § 682.411(d).

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 132 and, therefore, denies those allegations.

133.     Additionally, during the 16-180 period, ACS failed to advise Plaintiff that the loan would be assigned to the guaranty agency and the delinquency reported to the Consumer Reporting Agencies, constituting a separate violation of 34 CFR § 682.411(d).

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 133 and, therefore, denies those allegations.

134.     During the 181-270 days of the "delinquency," ACS failed to engage in efforts to urge Plaintiff to make the required payments on the loan, including providing information to the borrower regarding options to avoid default and the consequences of defaulting on the loan, in violation of 34 CFR § 682.411(e).

**ANSWER:**  Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 134 and, therefore, denies those allegations.

135.     In fact, the servicer made no efforts to contact Plaintiff whatsoever during the 23-month period of the putative "delinquency," which it wrongfully fabricated against Plaintiff, after Access Group told Plaintiff he was being placed in forbearance for up to three years.

**ANSWER:**  Access Group denies the allegations in Paragraph 135.

136.    Lastly, prior to a delinquent student loan being placed in default, 34 CFR § 682.411(f) requires a "final demand" letter to be sent:

On or after the 241st day of delinquency (the 301st day for loans payable in less frequent installments than monthly) the lender must send a final demand letter to the borrower requiring repayment of the loan in full and notifying the borrower that a default will be reported to each nationwide consumer reporting agency. The lender must allow the borrower at least 30 days after the date the letter is mailed to respond to the final demand letter and to bring the loan out of default before filing a default claim on the loan.

34 CFR § 682.411(f).

**ANSWER:** Paragraph 136 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

137.    On information and belief, which Plaintiff verily believes, ACS did not send the "final demand" letter required under law prior to declaring him in default.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 137 and, therefore, denies those allegations.

138.    The foregoing is based on ACS' description of when the loan was declared delinquent and in default, as well as Plaintiff's credit reports, but the identity of the servicer of Plaintiff's loan at any given point in time is in the sole possession of the Defendants.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 138 and, therefore, denies those allegations.

**Defendants Failed to Inform Borrower of Transfers of Servicing and Ownership**

139.    While Access Group's transfer to ACS for servicing was initiated December 23, 2011 (Ex. A), Plaintiff's alleged "default" and payment of the guaranty occurred on or about March 26, 2013, according to ACS (Ex. D).

**ANSWER:** Access Group admits that it transferred Plaintiff's loan to ACS for servicing in February 2012 and is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 139 and, therefore, denies those allegations.

140.    In addition to never being informed of the transfer of the servicing rights to the loan from Access Group to ACS, however, Plaintiff was also never informed of the transfer of the ownership from Access Group to ASA.

**ANSWER:**  Access Group denies the allegations in Paragraph 140.

141.    A servicer of a guaranty agency loan has due diligence obligations upon transfer of a covered student loan; however, in this case, Defendants recklessly ignored the requirements they agreed to observe.

**ANSWER:**  Access Group denies the allegations in Paragraph 141 as they pertain to

Access Group.

142.    If the assignment or transfer of ownership interest of a Stafford, PLUS, SLS, or Consolidation loan is to result in a change in the identity of the party to whom the borrower must send subsequent payments, the law requires that the assignor (here, Access Group) and assignee (here, ASA) shall, no later than 45 days from the date the assignee acquires a legally enforceable right to receive payment from the borrower on the assigned loan, provide, either jointly or separately, a notice to the borrower with certain enumerated information. 34 CFR § 682.208(e).

**ANSWER:**  Paragraph 142 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

143.    Specifically, the notice of transfer must inform the borrower of:

(i)    The assignment;

(ii)    The identity of the assignee;

(iii)    The name and address of the party to whom subsequent payments or communications must be sent;

(iv)    The telephone numbers of both the assignor and the assignee;

(v)    The effective date of the assignment or transfer of the loan;

(vi)    The date, if applicable, on which the current loan servicer will stop accepting payments;

(vii)    The date on which the new loan servicer will begin accepting payments.

34 CFR § 682.208(e)(1)(i)-(vii).

**ANSWER:** Paragraph 143 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

144.   If the assignor and assignee separately provide the notice required by paragraph (e)(1) of this section, each notice must indicate that a corresponding notice will be sent by the other party to the assignment.

**ANSWER:** Paragraph 144 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

145.   Neither Access Group, nor ACS, nor ASA ever provided the notice as required by 34 CFR § 682.208(e).

**ANSWER:**  Access Group denies the allegations in Paragraph 145 as they pertain to Access Group.

146.   Even if a student loan has not been assigned, but nevertheless there is a change in the identity of the party to whom the borrower must send subsequent payments or direct any communications concerning the loan, the holder of the loan shall, no later than 45 days after the date of the change, provide notice to the borrower of the name, telephone number, and address of the party to whom subsequent payments or communications must be sent. 34 CFR § 682.208(h).

**ANSWER:** Paragraph 146 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

147.   Neither Access Group, nor ACS, nor ASA ever provided the notice of servicing change required under 34 CFR § 682.208(h).

**ANSWER:**  Access Group denies the allegations in Paragraph 147 as they pertain to Access Group.

## **Defendants Repeatedly Violated the 45-Day Rule**

148.   34 CFR 682.411(b)(2) provides, in relevant part:

At no point during the periods specified in paragraphs (c), (d), and (e) of this section may the lender permit the occurrence of a gap in collection activity, as defined in paragraph (j) of this section, of more than 45 days (60 days in the case of a transfer).

**ANSWER:** Paragraph 148 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

149. Accordingly, Paragraph (j) defines a gap in collection activity as:

(1) Beginning on the date that is the day after –

(i) The due date of a payment unless the lender does not know the borrower's address on that date;

(ii) The day on which the lender receives a payment on a loan that remains delinquent notwithstanding the payment;

(iii) The day on which the lender receives the correct address for a delinquent borrower;

(iv) The day on which the lender completes a collection activity;

(v) The day on which the lender receives a dishonored check submitted as a payment on the loan;

(vi) The expiration of an authorized deferment or forbearance period on a delinquent loan; or

(vii) The day the lender receives information indicating it does not know the borrower's current address.

**ANSWER:** Paragraph 149 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

150. The Defendants Access Group, ACS, and ASA permitted a gap in collection activity to occur in Plaintiff's student loan.

**ANSWER:** Access Group denies the allegations in Paragraph 150 as they pertain to Access Group.

151. Access Group, ACS, and ASA, jointly and severally, violated the 45-day rule (60 days during the transfer period), because they ceased collection activity and did not practice due diligence in corresponding with Plaintiff.

**ANSWER:** Access Group denies the allegations in Paragraph 151 as they pertain to Access Group.

152. On each occasion speaking with any of the Defendants or their agents, Plaintiff provided true and correct information as to his address and phone number.

**ANSWER:** Access Group denies the allegations in Paragraph 152 as they pertain to Access Group.

153. In fact, Plaintiff's phone number and address stayed the same during the entire period in question, and to this day.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 153 and, therefore, denies those allegations.

### Defendants Violated the Skip-Tracing Rule

154. 34 CFR 682.411(h) reads in relevant part:

Skip-tracing.

(1) Unless the [Final Demand] letter specified under paragraph (f) of this section has already been sent, within 10 days of its receipt of information indicating that it does not know the borrower's current address, the lender must begin to diligently attempt to locate the borrower through the use of effective commercial skip-tracing techniques. These efforts must include, but are not limited to, sending a letter to or making a diligent effort to contact each endorser, relative, reference, individual, and entity, identified in the borrower's loan file, including the schools the student attended. For this purpose, a lender's contact with a school official who might reasonably be expected to know the borrower's address may be with someone other than the financial aid administrator, and may be in writing or by phone calls. These efforts must be completed by the date of default with no gap of more than 45 days between attempts to contact those individuals or entities.

**ANSWER:** Paragraph 154 consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

155. On information and belief, which Plaintiff verily believes, the Defendants never sent the letter required under paragraph (f) (the "Final Demand Letter"), and therefore were required to use commercial skip-tracing techniques to locate Plaintiff.

**ANSWER:** Access Group denies the allegations in Paragraph 155 as they pertain to Access Group.

156.    On information and belief, no Defendant ever utilized a commercial skip-tracing technique to locate Plaintiff.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 156 and, therefore, denies those allegations.

## COUNT I – VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS § 505/1, *ET SEQ.*

### *As to all Defendants*

157.    Plaintiff restates and realleges paragraphs 1-156, as if fully set forth herein.

**ANSWER:** Access Group restates and realleges its answers to Paragraphs 1-156, as if fully set forth herein.

158.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") forbids unfair or deceptive conduct in the course of commerce, and states in relevant part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

815 ILCS 505/2.

**ANSWER:** Paragraph 158 consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

159.    Plaintiff is a consumer.

**ANSWER:** Paragraph 159 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

160. Defendants' acts and omissions occurred in the course of trade and commerce.

**ANSWER:** Paragraph 160 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

161. The terms "unfair" and "deceptive," as used in the ICFA, are disjunctive, not conjunctive; in other words, a practice may violate the prohibition against unfairness while not violating the prohibition against deception, and vice-versa.

**ANSWER:** Paragraph 161 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

### *Unfair Conduct*

162. In determining whether a given course of conduct or act is unfair under the ICFA, consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

**ANSWER:** Paragraph 162 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

163. The published statement of factors considered by the Federal Trade Commission in measuring unfairness are: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers. See also *Robinson v. Toyota Motor Credit*, 201 Ill. 2d 403, 417-418, 775 N.E.2d 951, 961 (2002).

**ANSWER:** Paragraph 163 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

164. Courts may find unfairness even if the claim does not satisfy all three criteria. *Id.*

**ANSWER:** Paragraph 164 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

165.    For example, a "practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.*

**ANSWER:**  Paragraph 165 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

166.    A court addressing an ICFA Unfairness claim must consider whether the challenged practice, "offends public policy as established by statutes, the common law or otherwise, or, in other words, whether it is at least within the penumbra of some established concept of unfairness." *Boyd v. U.S. Bank, N.A.*, No. 10 C 3367, 787 F. Supp. 2d 747, 752 (N.D. Ill. Apr. 12, 2011) (citing *Ekl v. Knecht*, 585 N.E.2d 156, 163 (2nd Dist. 1991).

**ANSWER:**  Paragraph 166 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

167.    Here, Defendants' unfair conduct includes, *inter alia*:

(a)    All Defendants failed to honor the agreed-upon forbearance;

(b)    Access Group and/or ACS failed to document the agreed-upon forbearance, in violation of 34 CFR § 682.211(b)(1);

(c)    Access Group and/or ACS failed to record the terms of the agreed-upon forbearance in Plaintiff's file, in violation of 34 CFR § 682.211(b)(1);

(d)    Access Group and/or ACS failed to send required notices during forbearance, in violation of 34 CFR 682.211(e);

(e)    Access Group and ACS failed to exercise "due diligence" in the servicing of Plaintiff's student loan, in violation of 34 CFR § 682.411;

(f)    Access Group, ACS, and ASA failed to notify Plaintiff of transfer(s) of servicing and ownership of the subject student loan, in violation of 34 CFR § 682.208;

(g)    Access Group, ACS, and ASA permitted a gap in collection activity, in violation of 34 CFR § 682.411;

(h)    Access Group, ACS, and ASA failed to contact Plaintiff at all in approximately 23 months, despite Defendants having Plaintiff's current mailing address and telephone number at all relevant times;

(i)    ACS declared a wrongful default as to Plaintiff's student loan account;

(j)    All Defendants added and attempted to collect wrongful late fees, collection fees, and interest on Plaintiff's student loan account;

(k)    ACS, ASA, and Delta Management failed or refused to provide a reasonable resolution in response to Plaintiff's attempts, both directly and through the CFPB;

(l)    Delta Management directed Plaintiff to correspond with ASA and ASA directed Plaintiff to Delta Management, in avoidance of providing answers or a resolution;

(m)    F.H. Cann, in its June 1, 2017 letter, stated that Plaintiff could "enjoy...deletion of default status to the major credit reporting bureaus," in direct contravention of the provisions of the PCA Manual.

**ANSWER:**  Access Group denies the allegations in Paragraph 167 as they pertain to Access Group.

168.    The foregoing conduct offends public policy, as enumerated by the Code of Federal Regulations and the common law.

**ANSWER:**  Access Group denies the allegations in Paragraph 168 as they pertain to Access Group.

169.    The foregoing conduct is immoral, unethical, oppressive, and unscrupulous, in that it was done in attempt to profit from Plaintiff's student loan account.

**ANSWER:**  Access Group denies the allegations in Paragraph 169 as they pertain to Access Group.

170.    The foregoing conduct caused substantial injury to Plaintiff, and would cause substantial injury to any consumer, as it has resulted in pecuniary damages, as well as lost opportunities, annoyance, anxiety, aggravation, and negative credit reporting.

**ANSWER:**  Access Group denies the allegations in Paragraph 170 as they pertain to Access Group.

171.    Therefore, Plaintiff's claims satisfy all three criteria for unfair conduct, taken individually.

**ANSWER:**  Access Group denies the allegations in Paragraph 171 as they pertain to Access Group.

172.    In the alternative, Plaintiff's claims are unfair in the aggregate, because of the extent to which they meet any one of the unfairness criteria or because, to lesser extents, they meet all three.

**ANSWER:**    Access Group denies the allegations in Paragraph 172 as they pertain to Access Group.

### *Deceptive Conduct*

173.    The elements of a Deceptive claim under the ICFA are: (1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce.

**ANSWER:**    Paragraph 173 consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

174.    Here, Defendants' deceptive conduct includes, *inter alia*:

(a)    Access Group stated that Plaintiff's forbearance request was approved, yet subsequently failed to honor, record, and/or document the agreed-upon forbearance;

(b)    ASA stated that Plaintiff "had to be tracked down," despite all Defendants having Plaintiff's current mailing address and telephone number at all relevant times;

(c)    Delta Management, ASA's collector, stated that ASA sent letters to Plaintiff, in contradiction to the statement that Plaintiff "had to be tracked down;"

(d)    Delta Management stated that attempts were made to call Plaintiff and that his "voicemail wasn't set up," when Plaintiff's voicemail was working at all relevant times;

(e)    ASA and Delta Management tried to collect the loan, claiming ownership of the loan and a specified amount due, while simultaneously stating that ACS never provided any paperwork related to the servicing and ownership of the subject loan to ASA or Delta Management;

(f)    ACS stated that past due notices were sent and collection attempts were made, without any supporting documentation, despite no notices or attempts being made;

(g)    ACS stated to the CFPB that, "if Plaintiff is able to provide proof that his loans were rehabilitated he should forward this information to us," when, on information and belief, all relevant information was in Defendants' possession and control.

**ANSWER:** Access Group denies the allegations in Paragraph 174 as they pertain to Access Group.

175. Defendants intended that Plaintiff rely on said representations.

**ANSWER:** Access Group denies the allegations in Paragraph 175 as they pertain to Access Group.

176. Plaintiff indeed relied on the representation that his loan was in forbearance and stopped making payments.

**ANSWER:** Access Group denies the allegations in Paragraph 176 as they pertain to Access Group.

177. Defendants deceived Plaintiff and continue to attempt to collect an inflated student loan debt.

**ANSWER:** Access Group denies the allegations in Paragraph 177 as they pertain to Access Group.

178. At all relevant times, Defendants knew that their acts and omissions were in contravention of the Code of Federal Regulations' provisions governing the servicing of guaranty agency loans.

**ANSWER:** Access Group denies the allegations in Paragraph 178 as they pertain to Access Group.

179. At all relevant times, Defendants knew that their practices were non-compliant with the requirements of the provisions of 34 CFR 682.401 - Basic program agreement, which states at (b)(10)(i):

(1) The guaranty agency shall establish, disseminate to concerned parties, and enforce standards and procedures for -

***

(E) The exercise of due diligence by lenders in making, servicing, and collecting loans;

**ANSWER:** Access Group denies the allegations in Paragraph 179 as they pertain to Access Group.

180.    The deception occurred in the course of trade and commerce.

**ANSWER:** Access Group denies the allegations in Paragraph 180 as they pertain to Access Group.

181.    Defendants' conduct directly caused substantial injury to Plaintiff, as it has resulted in pecuniary damages, as well as lost opportunities, annoyance, anxiety, aggravation, and negative credit reporting.

**ANSWER:** Access Group denies the allegations in Paragraph 181 as they pertain to Access Group.

## COUNT II - VIOLATIONS OF THE FEDERAL DEBT COLLECTION PRACTICES ACT, 15 U.S.C. § 1692, *ET SEQ.*

### *As to Defendants ASA, Delta Management, and F.H. Cann*

182.    Plaintiff reasserts and realleges paragraphs 1-156, as if fully set forth herein.

**ANSWER:** Access Group restates and realleges its answers to Paragraphs 1-156, as if fully set forth herein.

183.    Plaintiff is a "consumer" as that term is defined by § 1692a(3) of the Federal Debt Collection Practices Act ("FDCPA").

**ANSWER:** Paragraph 183 consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

184.    The subject student loan is a "debt," as that term is defined by § 1692a(5) of the FDCPA.

**ANSWER:** Paragraph 184 consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

185.    Defendants ASA, Delta Management, and F.H. Cann are "debt collectors," as that term is defined by § 1692a(6) of the FDCPA, because they are regularly engaged in the collection

of debts for others and they took over the servicing and/or ownership of the subject debt when it was purportedly in default.

**ANSWER:** Paragraph 185 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

186.    Section 1692e of the FDCPA provides, in relevant part:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

\*\*\*

(2) The false representation of -

(A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

\*\*\*

(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

\*\*\*

(7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.

(8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

\*\*\*

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

**ANSWER:** Paragraph 186 consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

187. Accordingly, Defendants ASA, Delta Management, and F.H. Cann violated the FDCPA by, *inter alia*:

(a) Mischaracterizing Plaintiff's loan as in default, despite an agreed-upon forbearance;

(b) Adding and attempting to collect wrongful late fees, collection fees, and interest;

(c) Threatening, *inter alia*, garnishment of wages, seizure of tax refunds (and actually seizing another taxpayer's refund in relation to Plaintiff's student loan), no future federal student aid, and loss of deferment or, ironically, forbearance options;

(d) Stating that Plaintiff "had to be tracked down," implying that Plaintiff was evading his financial responsibility; this implication is particularly disgraceful, considering Plaintiff's immaculate record of timely payments prior to requesting and being approved for a forbearance;

(e) Stating that letters were sent to Plaintiff when they were not;

(f) Failing to report the subject debt as disputed; and

(g) Attempting to collect the subject debt, despite having no documentation evincing the servicing and ownership thereof.

(h) Sending, in the case of F.H. Cann, a letter stating or implying to a borrower that the default information reported by the original lender or by the guaranty agency or Department will be deleted or expunged

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 187 and, therefore, denies those allegations.

188. Additionally, section 1692g(b) provides:

(b) Disputed Debts

If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

**ANSWER:** Paragraph 188 consists of legal conclusions to which no response is required.

To the extent that any response is required, Access Group denies those allegations.

189.    As set forth *supra*, in response to F.H. Cann's April 4, 2017 letter, Plaintiff sent a letter to F.H. Cann on April 27, 2017 disputing the stated amount owed.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 189 and, therefore, denies those allegations.

190.    However, F.H. Cann failed to provide a validation of the debt to Plaintiff, in violation of the FDCPA.

**ANSWER:** Access Group is without knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 190 and, therefore, denies those allegations.

## COUNT III - BREACH OF CONTRACT

### *As to Defendants Access Group and ACS*

191.    Plaintiff reasserts and realleges paragraphs 1-156, as if fully set forth herein.

**ANSWER:** Access Group restates and realleges its answers to Paragraphs 1-156, as if fully set forth herein.

192.     This Count lies against both Access Group and ACS, because it is remains unknown which company failed to honor Plaintiff's agreed upon forbearance and such information is, on information and belief, in Defendants' sole possession and control.

**ANSWER:**  Access Group denies the allegations in Paragraph 192 as they pertain to Access Group.

193.     Plaintiff requested a forbearance of the subject student loan.

**ANSWER:**  Access Group denies the allegations in Paragraph 193.

194.     Defendant Access Group offered Plaintiff a forbearance for up to three years, with an interest rate that continued to accrue at 2.5%.

**ANSWER:**  Access Group denies the allegations in Paragraph 194.

195.     Plaintiff accepted the terms of the forbearance.

**ANSWER:**  Access Group denies the allegations in Paragraph 195.

196.     Thus, a contract was formed between Plaintiff and Access Group.

**ANSWER:**  Access Group denies the allegations in Paragraph 196.

197.     Plaintiff gave consideration for the contract by foregoing other alternatives to paying his student loan debt and ceasing his payments.

**ANSWER:**  Access Group denies the allegations in Paragraph 197.

198.     Access Group breached the contract with Plaintiff by declaring the subject student loan to be in default.

**ANSWER:**  Access Group denies the allegations in Paragraph 198.

199.     In the alternative, ACS breached the contract with Plaintiff by declaring the subject student loan to be in default.

**ANSWER:**  Access Group denies the allegations in Paragraph 199.

200.     As an actual and proximate result of the breach of contract, Plaintiff was damaged, in that, *inter alia*: (1) he lost other opportunities to pay down his student loan debt; (2) interest has accrued for almost six years, despite his efforts to pay the "legitimate" amount of the debt; (3) he has experienced negative reporting on his credit reports; (4) he was forced to retain counsel to attempt to resolve this matter; and (5) he has suffered emotional distress, anxiety, and aggravation.

**ANSWER:**  Access Group denies the allegations in Paragraph 200.

## COUNT IV - PROMISSORY ESTOPPEL

### As to Defendants Access Group and ACS

201.    Plaintiff reasserts paragraphs 1-156, as if fully set forth herein.

**ANSWER:**  Access Group restates and realleges its answers to Paragraphs 1-156, as if fully set forth herein.

202.    This Count lies against both Access Group and ACS, because it is remains unknown which company failed to honor Plaintiff's agreed upon forbearance and such information is, on information and belief, in Defendants' possession and control.

**ANSWER:**  Access Group denies the allegations in Paragraph 202 as they pertain to Access Group.

203.    Under Illinois law, promissory estoppel is an offensive, equitable cause of action. *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 524, 528 (Ill. 2009).

**ANSWER:**  Paragraph 203 consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

204.    To establish a claim of promissory estoppel, the plaintiff must prove that (1) the defendant made an unambiguous promise to the plaintiff; (2) the plaintiff relied on such promise; (3) the plaintiff's reliance was expected and foreseeable by the defendant; and (4) the plaintiff relied on the promise to her detriment. *Newton Tractor Sales,* 906 N.E.2d at 523-24 (citing *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 309-10, 565 N.E.2d 990 (Il. 1990)).

**ANSWER:**  Paragraph 204 consists of legal conclusions to which no response is required. To the extent that any response is required, Access Group denies those allegations.

205.    Access Group unambiguously promised to Plaintiff that he was granted a forbearance of up to three years, with an interest rate that continued to accrue at 2.5%.

**ANSWER:**  Access Group denies the allegations in Paragraph 205.

206.    Access Group's promise was intended to induce Plaintiff to rely on it and to, *inter alia*, cease making payments.

42

**ANSWER:** Access Group denies the allegations in Paragraph 206.

207. Plaintiff indeed relied on Access Group's promise by foregoing other options to pay his debt and by ceasing payments.

**ANSWER:** Access Group denies the allegations in Paragraph 207.

208. Plaintiff's reliance was reasonable.

**ANSWER:** Access Group denies the allegations in Paragraph 208.

209. Plaintiff's reliance was to his detriment, because Defendants failed to honor the agreed upon forbearance and wrongfully declared the subject student loan to be in default, resulting in, *inter alia*: (1) lost opportunities to pay the debt; (2) wrongful late fees, collection fees, and interest; (3) negative credit reporting; and (4) emotional distress, anxiety, and aggravation.

**ANSWER:** Access Group denies the allegations in Paragraph 209.

## COUNT V - FRAUDULENT MISREPRESENTATIONS

### *As to Defendants Access Group, ACS, ASA, and Delta Management*

210. Plaintiff reasserts and realleges paragraphs 1-156, as if fully set forth herein.

**ANSWER:** Access Group restates and realleges its answers to Paragraphs 1-156, as if fully set forth herein.

211. Defendants owed, and owe, a duty to Plaintiff to provide true and accurate information regarding his student loan account.

**ANSWER:** Access Group admits the allegations in Paragraph 211.

212. As set forth *supra*, Defendants made numerous false statements of material fact to Plaintiff.

**ANSWER:** Access Group denies the allegations in Paragraph 212 as they pertain to Access Group.

213. The misrepresentations include, *inter alia*:

      (a)     Access Group stated that Plaintiff's forbearance request was approved, yet subsequently failed to honor, record, and/or document the agreed upon forbearance;

      (b)     ASA stated Plaintiff "had to be tracked down," despite Defendants having Plaintiff's current mailing address and telephone number at all relevant times, both provided by Plaintiff as well as available in Plaintiff's credit reports;

      (c)     ACS stated that letters were sent to Plaintiff, in contradiction to the statement that Plaintiff "had to be tracked down";

      (d)     Delta Management stated that attempts were made to call Plaintiff and that his "voicemail wasn't set up," when Plaintiff's voicemail was working at all relevant times;

      (e)     ASA and Delta Management claimed ownership and a specific amount due, while also stating that ACS never provided any paperwork related to the servicing and ownership of the subject loan to ASA or Delta Management;

      (f)     ACS stated that past due notices were sent and collection attempts were made, without any supporting documentation;

      (g)     ACS stated to the CFPB that, "if Plaintiff is able to provide proof that his loans were rehabilitated he should forward this information to us," when, on information and belief, all relevant information remains Defendants' possession and control.

**ANSWER:** Access Group denies the allegations in Paragraph 213 as they pertain to Access Group.

214. Defendants knew said statements were false or were made recklessly and without regard for their truth.

**ANSWER:** Access Group denies the allegations in Paragraph 214 as they pertain to Access Group.

215. Defendants intended that Plaintiff rely upon the false statements.

**ANSWER:** Access Group denies the allegations in Paragraph 215 as they pertain to Access Group.

216. Plaintiff reasonably relied upon the false statements.

**ANSWER:** Access Group denies the allegations in Paragraph 216 as they pertain to Access Group.

217. Defendants' false statements damaged Plaintiff.

**ANSWER:** Access Group denies the allegations in Paragraph 217 as they pertain to Access Group.

## COUNT VI - NEGLIGENT MISREPRESENTATIONS

### (In the alternative to Count V)

*As to Defendants Access Group, ACS, ASA, and Delta Management*

218. Plaintiff reasserts and realleges paragraphs 1-156, as if fully set forth herein.

**ANSWER:** Access Group restates and realleges its answers to Paragraphs 1-156, as if fully set forth herein.

219. Defendants owed, and owe, a duty to Plaintiff to provide true and accurate information regarding his student loan account.

**ANSWER:** Access Group admits the allegations in Paragraph 219.

220. Defendants made numerous negligent, false, and material statements of fact regarding his student loan account.

**ANSWER:** Access Group denies the allegations in Paragraph 220 as they pertain to Access Group.

221. The misrepresentations include, *inter alia*:

(a) Access Group stated that Plaintiff's forbearance request was approved, yet subsequently failing to honor, record, and/or document the agreed upon forbearance;

(b) ASA stated that Plaintiff "had to be tracked down," despite Defendants having Plaintiff's current mailing address and telephone number at all relevant times, both provided by Plaintiff as well as available on his credit reports;

45

(c)     ACS stated that letters were sent to Plaintiff, in contradiction to the statement that Plaintiff "had to be tracked down;"

(d)     Delta Management stated that attempts were made to call Plaintiff and that his "voicemail wasn't set up," when Plaintiff's voicemail was working at all relevant times;

(e)     Delta Management and ASA claimed ownership and a specific amount due, while also stating that ACS never provided any paperwork related to the servicing and ownership of the subject loan to ASA or Delta Management;

(f)     ACS stated that past due notices were sent and collection attempts were made, without any supporting documentation;

(g)     ACS stated that, "if Plaintiff is able to provide proof that his loans were rehabilitated he should forward this information to us," when, on information and belief, all relevant information is in Defendants' possession and control.

**ANSWER:**     Access Group denies the allegations in Paragraph 221 as they pertain to Access Group.

222.     If Defendants did not know the foregoing statements were false, they could have known with minimal diligence and inquiry.

**ANSWER:**     Access Group denies the allegations in Paragraph 222 as they pertain to Access Group.

223.     Defendants intended that Plaintiff rely upon the false statements.

**ANSWER:**     Access Group denies the allegations in Paragraph 223 as they pertain to Access Group.

224.     Plaintiff reasonably relied upon the false statements.

**ANSWER:**     Access Group denies the allegations in Paragraph 224 as they pertain to Access Group.

225.     Defendants' false statements damaged Plaintiff.

**ANSWER:**     Access Group denies the allegations in Paragraph 225 as they pertain to Access Group.

46

## COUNT VII - FRAUDULENT CONCEALMENT

### *As to Defendants Access Group, ACS, and ASA*

226.    Plaintiff reasserts and realleges paragraphs 1-156, as if fully set forth herein.

**ANSWER:**  Access Group restates and realleges its answers to Paragraphs 1-156, as if fully set forth herein.

227.    As set forth *supra*, Defendants concealed certain material facts from Plaintiff regarding this student loan account.

**ANSWER:**  Access Group denies the allegations in Paragraph 227 as they pertain to Access Group.

228.    The concealed material facts include, *inter alia*:

(a)    Access Group concealed the fact that the subject student loan was not granted a forbearance, despite the telephone conversation to the contrary;

(b)    Access Group and ACS concealed the fact that subject student loan was transferred to a new servicer;

(c)    ACS and ASA concealed the fact that the subject student loan was transferred to a new owner;

(d)    Access Group and ACS concealed the fact that the subject student loan account was in arrears;

(e)    ACS and ASA concealed the fact that the subject student loan was declared to be in default;

(f)    Access Group, ACS, and ASA concealed the fact that late fees and collection fees were being added to the subject student loan.

**ANSWER:**  Access Group denies the allegations in Paragraph 228 as they pertain to Access Group.

229.    Defendants had a duty to disclose the foregoing material facts.

**ANSWER:** Access Group denies the allegations in Paragraph 229 as they pertain to Access Group.

230. The concealments were intended to induce a false belief, under circumstances creating a duty to speak.

**ANSWER:** Access Group denies the allegations in Paragraph 230 as they pertain to Access Group.

231. Plaintiff could not have discovered the truth through a reasonable inquiry or inspection.

**ANSWER:** Access Group denies the allegations in Paragraph 231 as they pertain to Access Group.

232. The concealed information was such that Plaintiff would have acted differently had he been aware of it.

**ANSWER:** Access Group denies the allegations in Paragraph 232 as they pertain to Access Group.

233. It should be noted that despite any allegations by Defendants that Plaintiff "had to be tracked down," Defendants had no problem reaching Plaintiff (at the same address he had at all relevant times and was provided to Access Group in December, 2011 and also reported on his Transunion credit report on December 18, 2011) *after* the purported default.

**ANSWER:** Access Group denies the allegations in Paragraph 233 as they pertain to Access Group.

## DEFENDANT ACCESSLEX INSTITUTE'S AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff has failed to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are pre-empted by the laws and regulations governing the FFELP Program and the Consolidation Loan Program, including, but not limited to 20 U.S.C. § 1098(g).

### THIRD AFFIRMATIVE DEFENSE

Plaintiff lacks standing under Article III of the Constitution. *See Spokeo v. Robins*, 136 S. Ct. 1540, 194 L.Ed.2d 635 (2016).

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the statute of limitations.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the statute of frauds.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the parol evidence rule.

### SEVENTH AFFIRMATIVE DEFENSE

To the extent that Access Group's conduct constitutes a violation of any law or regulation, which it specifically denies, such violation was not intentional and resulted from a *bona fide* error.

### EIGHTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff suffered any damages, Plaintiff failed to mitigate such damages.

### NINTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff suffered any damages, such damages were caused by parties other than Access Group.

WHEREFORE, Defendant Access Group respectfully requests that this Court enter judgment in its favor and against Plaintiff on all claims and award to Defendant all costs and attorneys' fees, as well as any other relief that this Court deems just and proper.

Respectfully submitted,

ESPOSITO & STAUBUS LLP

Dated: April 18, 2018           By: /s/ Bradley K. Staubus
                                   Bradley K. Staubus
                                   7055 Veterans Blvd., Unit B
                                   Burr Ridge, Illinois 60527
                                   Telephone: (312) 346-2766
                                   Facsimile: (312) 346-3177
                                   bks@eslaw500.com

*Attorneys for Defendant AccessLex Institute
d/b/a Access Group*

## <u>CERTIFICATE OF SERVICE</u>

  I, Bradley K. Staubus, an attorney, hereby certify that on April 18, 2018, I electronically filed the foregoing with the Clerk of the United States Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

        /s/ Bradley K. Staubus     

Bradley K. Staubus
Esposito & Staubus LLP
7055 Veterans Blvd., Unit B
Burr Ridge, Illinois 60527
Telephone: (312) 346-2766
Facsimile: (312) 346-3177
bks@eslaw500.com
*Attorneys for Defendant AccessLex Institute d/b/a Access Group*